UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>Plaintiff,<br><br>v.<br><br>GREYLOCK BEDFORD REAL ESTATE, LLC,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

**INTRODUCTION**

1.      Without applying for or receiving a federal construction general stormwater discharge permit, Greylock Bedford Real Estate, LLC ("Greylock") discharged stormwater from the site of its construction project (the "Project") located at 100 Plank Street in Bedford, Massachusetts (the "Site"). Greylock's construction activities resulted in discharges of polluted stormwater into catch basins on Taylor Pond Lane and Plank Street (the "Catch Basins") that are part of the City of Bedford's municipal separate storm sewer system ("Bedford MS4"). Pollutants from the Site are picked up in stormwater and discharged via the Catch Basins into wetlands that are adjacent to and have a continuous surface water connection to Beaver Brook (the "Beaver Brook Wetlands"), which ultimately drain into the Shawsheen River. Stormwater from the Site contains sediment, which poses a major threat to water quality, wetlands, and aquatic ecosystems, and it further impacts an environmental justice community downstream of the discharges.

2.	In addition to failing to obtain the required federal permit for these stormwater discharges before commencing construction, Greylock failed to control stormwater pollutant discharges, both of which amount to violations of the Federal Clean Water Act, 33 U.S.C. §§1251–1387 (the "Clean Water Act" or the "Act").

3.	The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Clean Water Act and seeks injunctive relief, civil penalties, reasonable costs including attorney fees, and other relief the Court deems appropriate to redress Greylock's illegal discharges of pollution.

## JURISDICTION AND VENUE

4.	This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

5.	On May 2, 2024, the Commonwealth provided notice of Greylock's violations of the Clean Water Act and of its intention to file suit against Greylock (the "Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection; and Greylock, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

6.	More than sixty days have passed since the Commonwealth served the Notice Letter.

7.	This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

8.	The Commonwealth has an interest in protecting for itself and its residents the integrity of the Massachusetts environment including its waters, and the related health, safety,

economic, recreational, aesthetic, and environmental interests those waters provide. Polluted stormwater is the leading cause of water quality impairment in Massachusetts.

9.    The Commonwealth has an interest in obtaining timely and accurate information concerning pollutant discharges into the Commonwealth's waters, as is required by the Act.

10.    The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Greylock's failure to comply with the Clean Water Act as alleged in this Complaint. Greylock's violations have threatened water quality in the Commonwealth and deprive the Commonwealth of essential information concerning water quality. Greylock's acts and omissions irreparably harmed the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law. The requested relief will redress the harm to the Commonwealth caused by Greylock's activities.

11.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## PARTIES

12.    Plaintiff is the Commonwealth, appearing by and through the Attorney General.

13.    The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts 02108. She is authorized to bring this action and to seek the requested relief under M.G.L. c. 12, §§ 3 and 11D.

14.    Greylock is a domestic profit corporation that lists its principal address as 110 Great Road, Bedford, Massachusetts 01730.

**STATUTORY BACKGROUND**

*Federal Clean Water Act Requirements*

15.     The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 301(a) of the Act, 33 U.S.C. § 1251(a).

16.     The Clean Water Act provides that the discharge of pollution into waters of the United States is unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

17.     During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Sediments such as sands, clays, and silts are the most common pollutants in stormwater runoff by volume and weight. Sediment discharge significantly harms Massachusetts waters and is the primary cause of river and stream degradation nationwide. Excess sediment destroys aquatic habitats. It smothers smaller organisms that live on the bottom of rivers, streams, and wetlands and starves the larger organisms that feed on them. Sediment also causes flooding by filling up areas that absorb rainwater and by altering riverine flows.

*The Federal Construction General Permit*

18.     To minimize polluted stormwater discharges from construction activities, EPA has issued a Construction General Permit for Stormwater Discharges from Construction

Activities (the "CGP") under the NPDES program. *See* 77 Fed. Reg. 12,286 (Feb. 29, 2012);

82 Fed. Reg. 6534 (Jan. 19, 2017); 84 Fed. Reg. 24,503 (May 28, 2019); 87 Fed. Reg. 3522

(Jan. 24, 2022).[1]

19.     An "operator" of a construction site that will disturb one or more acres of land

must apply for and begin complying with the CGP prior to commencing construction

activities. The CGP defines "construction activities" to include "earth-disturbing activities,

such as the clearing, grading, and excavation of land, and other construction-related activities .

. . that could lead to the generation of pollutants." Appendix A of the CGP, pg. A-2.

20.     Under the CGP, operators must conduct advanced planning to analyze the

potential for erosion, sedimentation, and other pollutant discharges from their projects,

and to design, install, and maintain stormwater controls to minimize stormwater pollutant

discharge during construction. CGP, Part 2.1.

21.     The advanced planning requirement is designed to ensure that stormwater

controls are fully installed and operational *before* initial site clearing, grading, excavating, and

other earth-disturbing activities commence. CGP, Part 2.1.3.

22.     As a first step in the advanced planning process, an operator must prepare a

stormwater pollution prevention plan ("SWPPP"). The SWPPP must adequately describe,

among other things: the factors relevant to selecting stormwater controls; the stormwater

controls selected; the maintenance requirements for stormwater controls; and the operator's

procedures for training, inspections, and corrective action. CGP, Part 7.

23.     The SWPPP must include a site map, showing, among other things, property

---

[1] With exceptions not relevant here, the 2022 version of the CGP contains clarification and updated provisions to the previous versions of the Permit, although the section and page numberings are occasionally different. For ease of reference, this Complaint cites to the 2022 CGP.

boundaries, locations where construction activities and other pollution-generating activities will occur, locations of all receiving waters, drainage patterns, extent of federally listed critical habitat, and locations of all erosion control measures. CPG, Part 7.2.4.

24.    The SWPPP must include a description of the construction activities, CGP, Part 7.2.3, and a description of stormwater controls, CGP, Part 7.2.6.

25.    The operator must consider certain factors, such as precipitation measurements, stormwater flow, and soil type in designing stormwater controls. CGP, Part 2.1.1.

26.    An operator must design and install stormwater controls in accordance with good engineering practices, CGP, Part 2.1.2, and properly maintain such controls, CGP, Part 2.1.4.

27.    In general, the CGP requires that the operator include specified stormwater controls, including, among other things, installing perimeter sediment controls and preserving native topsoil. CPG, Part 2.2.

28.    After completing the SWPPP, the operator must submit to EPA a "complete and accurate" Notice of Intent ("NOI") to be covered by the CGP. CGP, Part 1.4. According to the CGP, "[d]ischarges are not authorized if your NOI is incomplete or inaccurate . . . ." CGP, pg. 6, n. 8.

29.    Regardless of the content of the SWPPP, the CGP specifies that an operator has an independent duty to control stormwater discharges as necessary to meet applicable water quality standards. CGP, Part 3.

30.    The operator must also conduct regular site inspections to make sure all stormwater controls are installed and working properly, CGP, Part 4.6.1, and timely perform maintenance and corrective actions when they are not, CGP, Part 4.6.7. If a discharge is occurring during the inspection, the operator must identify its location and document its visual

quality and characteristics. CGP, Part 4. The operator must prepare an inspection report within twenty-four hours of completing the inspection, CGP, Part 4.7.

31.     An operator must also take corrective action to expeditiously repair or replace stormwater controls when necessary, and to eliminate any excessive stormwater pollution, water quality standard violation, or prohibited discharge, CGP, Part 5. When the problem requires a new or replacement control or significant repair, they must complete the work within seven calendar days of the day of discovery. If it is infeasible to complete this work within the seven-calendar day deadline, the operator must document why that is, and document a schedule for installing stormwater controls and making them operational as soon as feasible thereafter. CGP, Part 5.2.

32.     An operator must properly train staff to ensure appropriate personnel understand the requirements of the CGP and their responsibility with respect to those requirements. CGP, Part 6.

<em>Citizen Suit Provision of the Federal Clean Water Act</em>

33.     Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

34.     The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act, because it is a "person" having an interest which is or may be adversely affected by construction stormwater pollution discharges. 33 U.S.C. § 1365(g).

35.     Under Section 505 of the Act, this Court has authority to enjoin Greylock's violations of the Act's prohibition on unauthorized discharges of pollutants and to require

Greylock to comply with the CGP. The Court also has authority to impose penalties of up to $68,445 per day for each of Greylock's prior violations. *See* 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 1,377 (Jan. 8, 2025).

## STATEMENT OF FACTS

36.     Greylock specializes in the development and management of multi-family residential and office properties.

37.     Since at least October 2021, Greylock has been developing the Site, which is at least 1.3 acres, for mixed residential and office use. Greylock is planning for 52 residential units, including studio and one-bedroom apartments, and one office unit.

38.     The Site is adjacent to an area that has been designated by the Commonwealth as an environmental justice community because it has the potential to be disproportionately impacted by environmental harms and risks. Stormwater flows from the Site to the Beaver Brook Wetlands before draining into the Shawsheen River, which is within the area designated as an environmental justice community.

39.     Sometime between October 2021 and June 2022, without having first applied for, obtained, and complied with the CGP, Greylock began to deforest the Site and remove the top layer of soil in preparation for construction, leaving large swaths of unvegetated sediment exposed to precipitation and susceptible to being mobilized and carried off the Site in rain events.

40.     In addition to the exposed and mobile sediments, the Site is also likely to contain pollutants associated with construction activities, including debris, silt, sand, cement, concrete, oil or petroleum, organic material, and other construction-related materials such as vehicles or wastes.

41.     The Site slopes to the east and drains into the Beaver Brook Wetlands via catch basins located on Taylor Pond Lane and Plank Street.

42.     During every rain and snowmelt event listed in Exhibit A, runoff from the Site travels over the surface of the Site, picks up sediments and other pollutants, and discharges them to the Beaver Brook Wetlands, which ultimately drain into the Shawsheen River. The following figures, taken from Google Earth Pro, have been annotated by the Attorney General's Office to identify the location of sediment discharged from the Site and the direction of stormwater flow from the Site into the catch basins on Taylor Pond Lane and Plank Street, which are part of Bedford's MS4. The images are dated July 2023.





43.     The following photograph was taken by the Attorney General's Office in the area of Plank Street near the entrance to the Site on March 10, 2024. It shows the presence of sediment washout resulting from sediment discharges from the Site onto Taylor Pond Lane and Plank Street. It has been annotated by the Attorney General's Office.



44.     The next figure, below, is a June 2023 aerial image from Google Earth Pro showing the deforested Site and the exposed sediment left by Greylock's construction activities. The image has been annotated by the Attorney General's Office to show the Site, which drains to the Beaver Brook Wetlands.



45.     The Massachusetts Department of Fish and Game ("DFG") mapped a portion of the Shawsheen River connected to the Beaver Brook Wetlands, into which Greylock discharges its stormwater, as Priority Habitat and as BioMap Aquatic and Rare Species Core Habitat for the Bridle Shiner (*Notropis bifrenatus*). The Bridle Shiner is a freshwater fish species, which DFG listed as a Species of Special Concern and a Species of Greatest Conservation Need under the State Wildlife Action Plan. The DFG has determined that the protection of habitat is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes in Massachusetts.

*Impacts from Pollutants in Greylock's Stormwater Discharges*

46.	Sediment pollution is the most significant cause of water quality degradation in rivers and streams in the United States. Excessive sediment discharged to waterways destroys habitat, harms aquatic organisms, and can contribute to flooding.

47.	Sediment settles to the bottom of waterbodies where it disrupts and smothers bottom-feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe.

48.	Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reduces light penetration, decreases the ability of plant communities to photosynthesize, prevents animals from seeing food, and harms fish populations.

49.	Sediment poses particular risks to wetlands, which play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity in wetlands is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects.

50.	Sediment can harm wetlands by, among other ways, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soil, and downstream water quality and significantly increase the risk of flooding.

51.	Based on the construction activities Greylock has conducted at the Site as set forth above, the Site is subject to the requirements of the CGP.

52.     Greylock failed to timely apply for or obtain CGP coverage for its stormwater discharges related to the development of the Site.

53.     Greylock failed to timely implement the terms of the CGP, which are set forth at paragraphs 20-32, above.

**FIRST CAUSE OF ACTION**
**Unpermitted Discharges of Construction Stormwater Without a Federal Construction General Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

54.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

55.     Greylock is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

56.     The Shawsheen River, Beaver Brook, and the Beaver Brook Wetlands, which is adjacent to and has a continuous surface water connection with Beaver Brook, are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

57.     By discharging stormwater from the Site while performing construction activities at the Site without coverage under the CGP, Greylock violated Section 301(a) of the Act, 33 U.S.C. § 1311.

58.     Every day since Greylock commenced construction activities, as that term is defined in the CGP, and Greylock discharged stormwater from the Site into Bedford MS4 without a CGP, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C.§§ 1365(a)(1) and (f).

59.     These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION
**Noncompliance with the Federal Construction General Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. §1311(a)**

60.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

61.     Greylock violated the CGP by failing to implement its requirements, as set forth in paragraphs 20-32, above.

62.     Greylock's violations of each of the requirements set forth in paragraphs 20-32 above are separate and distinct violations of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

63.     These violations establish an ongoing pattern of violations with the CGP's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.      Require Greylock to comply with the CGP.

2.      Order Greylock to pay civil penalties of up to $68,445 per day for each of its prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 88 Fed. Reg. 1,377 (Jan. 8, 2025);

3.      Order Greylock to take appropriate actions to restore the quality of wetlands and waterways impaired by its unlawful activities;

14

4.      Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.      Award any such other and further relief as this court may deem appropriate.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

Michele A. Hunton, (Bar. No. 667766)
Helen D. Yurchenco, (Bar No.712235)
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2274
Email: michele.hunton@mass.gov
        helen.yurchenco@mass.gov

Dated: 4/30/2025

15

EXHIBIT A

DAYS BETWEEN OCTOBER 1, 2021, AND APRIL 29, 2025 ON WHICH STORMWATER FROM SITE DISCHARGED INTO WATERS OF THE UNITED STATES

| Year | Month | Date |
|---|---|---|
| 2021 | October | 4, 25, 26 |
| | November | 12 |
| | December | 11, 18 |
| 2022 | January | 17 |
| | February | 4, 22, 25 |
| | March | 24 |
| | April | 8, 9, 19 |
| | June | 9, 27 |
| | September | 5, 6 |
| | October | 13, 14, 17 |
| | November | 16, 27, 30 |
| | December | 7, 16, 23, |
| 2023 | January | 3, 19, 23, 26 |
| | February | 23 |
| | March | 2, 4, 13, 14 |
| | May | 20 |
| | June | 2, 9, 17, 28 |
| | July | 2, 3, 10, 16, 29 |
| | August | 8, 15, 18, 25 |
| | September | 8, 10, 13, 18, 29 |
| | October | 21, 30 |
| | November | 22 |
| | December | 3, 10, 11, 17, 18, 28 |
| 2024 | January | 9, 10, 13, 24, 26 |
| | March | 2, 7, 10, 23, 28 |
| | April | 3, 4, 12 |
| | May | 8, 30 |
| | June | 14 |
| | July | 5 |
| | August | 15, 19 |
| | September | 21 |
| | November | 21, 22, 23, 28 |
| | December | 11, 30 |
| 2025 | January | 1, 31 |
| | February | 13, 16 |
| | March | 5, 17, 24, 31 |
| | April | 26 |

Exhibit A – Page 1